1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RAYMOND D. JACKSON,                         No.  2:  11-cv-1157 JAM KJN P

12                    Plaintiff,

13         v.                                      FINDINGS AND RECOMMENDATIONS

14    STEVEN PLETCHER, et al.,

15                    Defendants.

16

17    Introduction

18          Plaintiff is a state prisoner, proceeding through counsel, with a civil rights action pursuant

19    to 42 U.S.C. § 1983.  The remaining issue in this action is whether defendant Osman provided

20    plaintiff with inadequate medical care in October 2008.

21          Pending before the court is defendant Osman's summary judgment motion.  (ECF No.

22    225.)  For the following reasons, the undersigned recommends that defendant Osman's motion for

23    summary judgment be granted.

24    Legal Standard for Summary Judgment

25          Summary judgment is appropriate when it is demonstrated that the standard set forth in

26    Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

27    movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

28    judgment as a matter of law."  Fed. R. Civ. P. 56(a).

1

1   Under summary judgment practice, the moving party always bears the initial responsibility of

2   informing the district court of the basis for its motion, and identifying those portions of "the

3   pleadings, depositions, answers to interrogatories, and admissions on file, together with the

4   affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

5   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

6   56(c).) "Where the nonmoving party bears the burden of proof at trial, the moving party need

7   only prove that there is an absence of evidence to support the non-moving party's case." Nursing

8   Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

9   387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

10  Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

11  burden of production may rely on a showing that a party who does have the trial burden cannot

12  produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment

13  should be entered, after adequate time for discovery and upon motion, against a party who fails to

14  make a showing sufficient to establish the existence of an element essential to that party's case,

15  and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322.

16  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

17  necessarily renders all other facts immaterial." Id. at 323.

18        Consequently, if the moving party meets its initial responsibility, the burden then shifts to

19  the opposing party to establish that a genuine issue as to any material fact actually exists. See

20  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to

21  establish the existence of such a factual dispute, the opposing party may not rely upon the

22  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

23  form of affidavits, and/or admissible discovery material in support of its contention that such a

24  dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party

25  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

26  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

27  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

28  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

1    a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

2    (9th Cir. 1987).

3          In the endeavor to establish the existence of a factual dispute, the opposing party need not

4    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

5    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6    trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

7    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

8    Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

9    amendments).

10         In resolving a summary judgment motion, the court examines the pleadings, depositions,

11    answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

12    Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

13    255.  All reasonable inferences that may be drawn from the facts placed before the court must be

14    drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

15    are not drawn out of the air, and it is the opposing party's obligation to produce a factual

16    predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

17    Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

18    demonstrate a genuine issue, the opposing party "must do more than simply show that there is

19    some metaphysical doubt as to the material facts. . . .  Where the record taken

20    as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

21    'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

22    Legal Standard for Eighth Amendment Claims

23         To succeed on an Eighth Amendment claim predicated on the denial of medical care, a

24    plaintiff must establish that he had a serious medical need and that the defendant's response to

25    that need was deliberately indifferent.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); see

26    also Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A serious medical need exists if the failure to

27    treat the condition could result in further significant injury or the unnecessary and wanton

28    infliction of pain.  Jett, 439 F.3d at 1096.  Deliberate indifference may be shown by the denial,

1   delay or intentional interference with medical treatment or by the way in which medical care is

2   provided.  Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988).  To act with deliberate

3   indifference, a prison official must both be aware of facts from which the inference could be

4   drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Farmer

5   v. Brennan, 511 U.S. 825, 837 (1994).  Thus, a defendant is liable if he knows that plaintiff faces

6   "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures

7   to abate it."  Id. at 847.  "[I]t is enough that the official acted or failed to act despite his

8   knowledge of a substantial risk of serious harm."  Id. at 842.

9        A physician need not fail to treat an inmate altogether in order to violate that inmate's

10   Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A

11   failure to competently treat a serious medical condition, even if some treatment is prescribed, may

12   constitute deliberate indifference in a particular case.  Id.

13        It is well established that mere differences of opinion concerning the appropriate treatment

14   cannot be the basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332

15   (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

16   Legal Standard for Qualified Immunity

17        In analyzing a claim of qualified immunity, a court must examine (1) whether the facts as

18   alleged, taken in the light most favorable to plaintiff, show that the defendant's conduct violated a

19   constitutional right, and (2) if a constitutional right was violated, whether, "in light of the specific

20   context of the case," the constitutional right was so clearly established that a reasonable official

21   would understand that what he or she was doing violated that right.  See Saucier v. Katz, 533 U.S.

22   194, 201–02 (2001).  If no constitutional right was violated, the inquiry ends and the defendant

23   prevails.  Saucier, 533 U.S. at 201.

24        To meet the "clearly established" requirement, "[t]he contours of the right must be

25   sufficiently clear that a reasonable official would understand that what he is doing violates that

26   right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  This requires defining the right

27   allegedly violated in a "particularized" sense that is "relevant" to the actual facts alleged.  Id.

28   "Because the focus is on whether the officer had fair notice that her conduct was unlawful,

4

1   reasonableness is judged against the backdrop of the law at the time of the conduct."  <u>Brosseau v.</u>

2   <u>Haugen</u>, 543 U.S. 194, 198 (2004).

3          Courts are not required to address the two inquiries in any particular order.  Rather, courts

4   may "exercise their sound discretion in deciding which of the two prongs of the qualified

5   immunity analysis should be addressed first in light of the circumstances in the particular case at

6   hand."  <u>Pearson v. Callahan</u>, 555 U.S. 223, 243 (2009).

7   <u>Plaintiff's Claims</u>

8          This action is proceeding on the second amended complaint filed May 21, 2012.  (ECF

9   No. 103-1.)  The only remaining defendant is defendant Osman.  The court previously dismissed

10  the claims against defendants Bick and Aguilera on grounds that they were not administratively

11  exhausted.  (ECF No. 220).  Plaintiff voluntarily dismissed the claims against the other named

12  defendants.  (ECF Nos. 119, 128, 185, 196.)

13         To put the remaining claim against defendant Osman in context, the undersigned sets forth

14  herein the relevant allegations contained in the second amended complaint.

15         Plaintiff alleges that he had problems with his nose which got worse in 2008.  (ECF No.

16  103-1 at 5.)  His symptoms included periodic unexplained bleeding, pain, nasal congestion,

17  obstruction and discharge of mucoid debris.  (<u>Id.</u>)  Plaintiff alleges that on or about October 7,

18  2008, he was seen by defendant Osman, his primary care physician, regarding his nose problems.

19  (<u>Id.</u> at 7.)  Defendant Osman allegedly prescribed saline spray and had plaintiff apply Vaseline to

20  the interior of his nose.  (<u>Id.</u>)  Plaintiff's symptoms became worse.  (<u>Id.</u>)  Plaintiff saw defendant

21  Osman again on October 29, 2008, for his nose problems.  (<u>Id.</u>)  Defendant Osman again

22  prescribed saline spray and Vaseline.  (<u>Id.</u>)

23         On December 15, 2008, plaintiff filed an administrative appeal complaining about various

24  matters, including the large hole, i.e. perforation, that was found in his nose by Dr. Hall, an

25  otolaryngologist working on a contract basis at the California Medical Facility ("CMF"), on May

26  21, 2008.  (<u>Id.</u> at 7-8.)  Plaintiff requested a second opinion and that he be allowed to see an

27  outside specialist.  (<u>Id.</u>)  Plaintiff's request to see an outside specialist was denied, but he was

28  again referred to Dr. Hall.  (<u>Id.</u> at 8.)

On January 28, 2009, plaintiff was seen by Dr. Hall who did not recommend any alternative treatment or surgery.  (Id.)  Dr. Hall also did not authorize a biopsy.  (Id.)  Dr. Andreasen advised plaintiff that he could see an outside consultant if he paid for it.  (Id.)  Because plaintiff had no money, he could not see an outside consultant.  (Id.)

Plaintiff appealed the denial of his request to see an outside consultant.  (Id.)  This second level appeal was granted.  (Id.)  In accordance with granting this appeal, Dr. Hall authorized plaintiff to see a specialist at the University of California San Francisco ("UCSF").  (Id.)  Later, Dr. Hall changed his mind and authorized a consult with Dr. Owens, an otolaryngologist practicing out of the Queen of the Valley Hospital in Napa, California.  (Id.)  The referral papers, signed by defendant Aguilera, requested a repair of the perforated septum.  (Id. at 9.)  No diagnostic tests, such as a biopsy, were requested.  (Id.)

On April 7, 2009, Dr. Owens examined plaintiff.  (Id.)  Dr. Owens referred plaintiff back to CMF with a finding that he was not confident in his ability to close a perforation of the size in plaintiff's nose.  (Id.)  Dr. Owens suggested a referral to UCSF.  (Id.)  The referral to UCSF was later authorized.  (Id.)

On June 24, 2009, plaintiff was seen by Dr. Pletcher, an otolaryngologist, at UCSF.  (Id.)  Dr. Pletcher stated that plaintiff's nose looked clean, prescribed a nasal spray with Vaseline, and sent plaintiff back to CMF with no further recommendations.  (Id.)  No follow up visits were scheduled.  (Id.)  Dr. Pletcher refused plaintiff's request for a biopsy or other diagnostic tests on his nose.  (Id.)

During the months following the examination by Dr. Pletcher, plaintiff's nose condition deteriorated.  (Id. at 10.)

On September 9, 2009, plaintiff was examined by Dr. Long, a contract physician at CMF.  (Id.)  Dr. Long examined plaintiff's nose and found that plaintiff may have early stage cancer in his nose.  (Id.)

Plaintiff's nose condition became so bad that in early 2010, defendant Aguilera approved plaintiff to see Dr. Pletcher again.  (Id. at 11.)  On February 26, 2010, Dr. Pletcher examined plaintiff.  (Id.)  At that time, a biopsy was done on plaintiff's septum, and the pathologic

1    diagnosis was that he had "at least" squamous cell carcinoma in situ.  (Id.)  On March 2010, Dr.

2    Pletcher was scheduled to perform surgery to remove the cancer.  (Id.)  During this surgery, Dr.

3    Pletcher discovered that the cancer had spread far wider than anticipated.  (Id.)  Dr. Pletcher

4    referred the matter to an associate, Dr. Ivan H. El-Sayed, who undertook a total rhinectomy of

5    plaintiff's nose on March 24, 2010.  (Id. at 11-12.)

6            Plaintiff alleges that in October 2008 defendant Osman violated his Eighth Amendment

7    right to adequate medical care by ignoring his requests for diagnostic tests which would have

8    determined the presence of cancer sooner.  (See findings and recommendations addressing

9    defendants' motion to dismiss for failure to exhaust administrative remedies; ECF No. 214 at 10.)

10   Undisputed Facts

11           Both parties submitted statements of undisputed facts.  For the most part, plaintiff does

12   not dispute defendant's statement of undisputed facts.  (ECF No. 243-2 (plaintiff's response to

13   defendant's state of undisputed facts).)  With regard to facts material to the remaining claim, i.e.,

14   whether defendant Osman acted with deliberate indifference to plaintiff in October 2008,

15   plaintiff's separate statement of undisputed facts is not significantly different from defendant's

16   statement of undisputed facts.  (ECF No. 243-3.)  Accordingly, with a few exceptions noted

17   below, the court adopts the undisputed facts on which both parties agree.

18           Plaintiff is a state prisoner in the California Department of Corrections and Rehabilitation

19   ("CDCR").  (ECF Nos. 243-2 at 1, 243-3 at 1.)  At all relevant times, plaintiff was housed at

20   CMF.  (Id.)  Defendant Osman has been employed by the CDCR since 2008 as a physician and

21   surgeon.  (ECF Nos. 243-2 at 2, 243-3 at 1-2.)  In that capacity, defendant Osman's

22   responsibilities include treating inmates in the clinics in the prison.  (ECF Nos. 243-2 at 2, 243-3

23   at 2.)  Defendant Osman is not an otolaryngologist or an oncologist.  (ECF No. 243-2 at 2.)

24   Defendant Osman also has no training in otolaryngolosty or oncology.  (Id.)

25           Defendant Osman was plaintiff's primary care provider ("PCP") from approximately

26   September 2008 through August 2009.  (Id.)

27           On May 14, 2008, Dr. Hall, an otolaryngologist at CMF, examined plaintiff and found a

28   perforation of plaintiff's nasal septum.  (ECF No. 243-2 at 2, 243-3 at 2.)  In his separate

1   statement of undisputed facts, plaintiff states that Dr. Hall determined that the perforation was

2   "large." (ECF No. 243-3 at 2.)  Medical records from this exam state that the perforation was

3   "large." (ECF No. 244-1.)  Dr. Hall believed that the perforation had been long-standing, likely

4   for over twenty years.  (ECF No. 243-2 at 2.)  Dr. Hall recommended that plaintiff rinse his nose

5   daily with saline and lubricate his nose with Polysporin ointment as there appeared to be a low-

6   grade infection around the perforation.  (ECF Nos. 243-2 at 2-3, 243-3 at 3.)

7           A perforation of the nasal septum is a hole in the septum composed of cartilage and thin

8   bone. (ECF No. 243-2 at 3, 243-3 at 3.)  There are several causes for such perforations, including

9   intranasal drug abuse, trauma, piercings, complications of previous nasal surgery, excessive nose

10  picking, or diseases such as tuberculosis or syphilis.  (ECF No. 243-2 at 3.)  Many septal

11  perforations do not require surgical repair or closure and small perforations may need only

12  frequent rinsing with prescription saltwater or saline solutions and applying lubricating gels.  (Id.)

13          Diagnosis and treatment of a perforation of a nasal septum is not within the general

14  purview or expertise of a general practice physician.  (Id.)  This condition is best treated by a

15  physician trained in otolaryngology, the medical and surgical management and treatment of

16  patients with diseases and disorders of the ear, nose and throat ("ENT").  (Id.)

17          On September 24, 2008, defendant Osman examined plaintiff.  (ECF Nos. 243-2 at 3, 243-

18  3 at 3.)  Plaintiff had a history of chronic back pain and renal failure.  (ECF No. 243-2 at 3-4.)

19  Defendant Osman reviewed plaintiff's multiple medical conditions including his complaints of

20  nasal allergies and wrote orders to continue his medications.  (ECF Nos. 243-2 at 4, 243-3 at 3.)

21  Defendant Osman wrote orders to provide plaintiff with Benadryl as needed.  (Id.)  Defendant

22  Osman also renewed a functional capacity chrono for plaintiff because of his limitations with

23  sitting, standing and walking.  (ECF No. 243-2 at 4.)

24          On October 7, 2008, defendant Osman saw plaintiff for a follow up appointment.  (ECF

25  Nos. 243-2 at 4, 243-3 at 3.)  Plaintiff reported that he was experiencing intermittent nose bleeds.

26  (ECF No. 243-2 at 4.)  Defendant Osman reviewed plaintiff's file and determined that plaintiff

27  had been evaluated by Dr. Hall, an otolaryngologist at CMF, in May of 2008.  (Id.)  Dr. Hall had

28  diagnosed a large septal perforation in plaintiff's nose and wrote orders for plaintiff to use nasal

saline and apply Polysporin to the interior of his nasal area.  (Id.)  Defendant Osman continued

Dr. Hall's orders for plaintiff to use saline nasal spray and the application of Vaseline to

moisturize the interior of plaintiff's nasal area.  (ECF Nos. 243-2 at 4, 243-3 at 3.)

On October 29, 2008, defendant Osman reordered nasal spray for plaintiff.[1]  (ECF No.

246 at 6 (entry in plaintiff's medical records).)

On October 31, 2008, defendant Osman saw plaintiff for a follow-up appointment.  (ECF

No. 225-5 at 12 (entry in plaintiff's medical records).)  In the entry for this date, defendant

Osman wrote that plaintiff's nasal problems were improving.[2]  (Id.)  Defendant Osman continued

to renew orders for the previously prescribe medication because of the improving conditions.

(Id.)

Between November 2008 and January 2009, defendant Osman continued to renew orders

for saline nasal spray and Vaseline or A + D ointment.[3]  (ECF Nos. 243-2 at 5.)

When Dr. Hall again examined plaintiff's nose on January 8, 2009, he noted that the

perforation appeared to be the same size that he had observed in May 2008 and that plaintiff was

doing reasonably well with the treatment program of the daily rinses and ointment.  (ECF No.

243-2 at 5.)

////

---

[1]  It is not clear from the October 29, 2008 entry whether defendant Osman actually examined plaintiff on that date or whether he only re-ordered medication for plaintiff, including nasal spray.

[2]  In his response to defendant's statement of undisputed facts, plaintiff appears to dispute that the October 31, 2008 examination occurred.  (ECF No. 243-2 at 4.)  Plaintiff refers to the October 29, 2008 entry in plaintiff's medical records where defendant Osman re-ordered medication.  (Id.) The undersigned has located the October 31, 2008 entry in plaintiff's medical records made by Dr. Osman.  (ECF No. 225-5 at 12.)  It appears that plaintiff is unaware of this entry.

[3]  In his response to defendant's statement of undisputed facts, plaintiff claims that on December 11, 2008, plaintiff voiced his concern to defendant that his condition was getting worse.  (ECF No. 243-2 at 5.)  Plaintiff alleges that defendant Osman told him that there was nothing that he could do for his nose.  (Id.)   The second amended complaint does not contain a claim against defendant Osman alleging inadequate medical care in December 2008.  Rather, the allegations in the second amended complaint against defendant Osman concern his treatment of plaintiff in October 2008.  (ECF No. 103-1. at 7.)  The allegations in the second amended complaint regarding December 2008 do not mention defendant Osman.  (Id. at 7-8.)

A nasal cavity biopsy could not be performed at CMF because it is a highly specialized procedure. (ECF No. 243-2 at 6.)  Even if plaintiff had requested a biopsy, defendant Osman would not have ordered one.  (Id.)  Defendant Osman would have referred plaintiff to an otolaryngologist to determine whether a biopsy was necessary because an otolaryngologist has knowledge superior to defendant Osman's regarding nasal conditions.  (Id.)

Any biopsy of a nasal septum defect would not have been a trivial task and carries a significant risk of bleeding, infection and a worsening of the condition.  (Id.)  This risk would be of additional concern for a patient like plaintiff who was immune-suppressed because of his kidney transplant.  (Id.)

When defendant Osman treated plaintiff in October 2008, plaintiff's perforation of the nasal septum was already being treated by otolaryngologist Dr. Hall.  (Id.)

Discussion

Defendant Osman moves for summary judgment on grounds that he did not act with deliberate indifference to plaintiff in October 2008.  Defendant also argues that he is entitled to qualified immunity.

In support of his motion, defendant refers to the declaration of his expert Dr. Fee, a professor of otolaryngology/head and neck surgery, emeritus at Stanford University.  (ECF No. 225-3.)  Dr. Fee states that it is his opinion that when Dr. Osman treated plaintiff in October 2008, plaintiff's perforation of the nasal septum was already being treated by otolaryologist Dr. Hall, and it was reasonable and within the standard of care for Dr. Osman to continue the course of treatment recommended by Dr. Hall:

> 3.   On May 14, 2008, Dr. Hall, an otolaryngologist at CMF, examined Mr. Jackson and found a perforation of Mr. Jackson's nasal septum.  Dr. Hall believed that the perforation had been long-standing, likely for over twenty years and probably caused by intranasal drug abuse years previously.  Dr. Hall recommended that Mr. Jackson rinse his nose daily with saline and lubricate his nose with Polysporin ointment as there appeared to be probably a low-grade infection around the perforation.
>
> 4.  When Dr. Hall examined Jr. Jackson's nose on January 8, 2009, Dr. Hall noted that the perforation appeared to be the same size that he had observed in May 2008 and that Mr. Jackson was doing reasonably well with treatment program of daily rinses and

ointments.

5. A perforation of the nasal septum is a hole in the septum, composed of cartilage and thin bone. There are several causes for such perforations, including intranasal drug abuse, trauma, piercings, complications of previous nasal surgery, excessive nose picking, or diseases such as tuberculosis or syphilis. Many septal perforations do not require surgical repair or closure, and small perforations may need only frequent rinsing with prescription saltwater or saline solutions and applying lubricating gels.

6. Diagnosis and treatment of a perforation of a nasal septum is not within the general purview or expertise of a general practice physician. This condition is best treated by a physician trained in otolaryngology, the medical and surgical management and treatment of patients with diseases and disorders of the ear, nose and throat (ENT).

7. It is my opinion that when Dr. Osman treated Mr. Jackson in October 2008, Mr. Jackson's perforation of the nasal septum was already being treated by otolaryngologist Dr. Hall and it was reasonable and within the standard of care for Dr. Osman to continue the course of treatment recommended by Dr. Hall.

8. I have seen no evidence in the records that Dr. Osman fell below the community standard of care in the treatment of Mr. Jackson's nose, nor is there evidence of any indifference by Dr. Osman to Mr. Jackson's nose. Mr. Jackson was repeatedly seen by ENT specialists, including Drs. Hall, Owens and Pletcher. It was reasonable for Dr. Osman to rely on the treatment recommended by Dr. Hall. Furthermore, it would not have been appropriate for anyone other than an otolargyngologist to have done an intranasal biopsy of Mr. Jackson.

(Id. at 1-3.)

In his opposition, plaintiff relies on the declaration of his expert Dr. Richard Lopchinsky, Chief of ENT/Head and Neck Service at the Phoenix Veterans Administration Health Care System from 2008 to 2010. (ECF No. 147 at 2.) In 2010, Dr. Lopchinsky was appointed to a position of Clinical Professor of Surgery at the University of Arizona School of Medicine, Phoenix Campus. (Id.)

In his declaration, Dr. Lopchinsky describes defendant Osman's treatment of plaintiff as follows: 1) On September 24, 2008, plaintiff saw his primary care provider who diagnosed nasal allergies and prescribed diphenhydramine and a follow-up in one month. No documentation of follow-up was made; 2) on September 9, 2009, the plaintiff again requested help from Dr. Osman because his nose was getting worse; plaintiff was apparently seen by Dr. Long; 3) on September

11

23, 2009, plaintiff again requested medical care from defendant Osman.  (Id. at 3, 5.)

Dr. Lopchinsky concludes that, in his opinion, to a reasonable degree of medical certainty, there was a delay in diagnosis of nasal cancer from the end of May 2008 until February 2010:

> The Plaintiff had had a renal transplant and was on immunosuppression.  Such patients require a heightened suspicion for the development of malignancies.
>
> The medical records obtained from the California Medical Facility were grossly inadequate with only rare progress notes documented. If the progress notes were inadequate, one must assume that the care was as well.
>
> There is documentation of saline nasal sprays prior to May 2008 but no record to any prior nasal exams. There is no documentation of nasal exam by a primary care provider or an ENT specialist.
>
> Dr. Hall had noted what was apparently a new septal perforation without any etiology in his initial exam on 5/21/08.  This perforation became more and more symptomatic without any known precipitating cause in a patient who was immunocompromised.  As the patient became more and more symptomatic despite usually successful conservative management, a biopsy or at the very least, an imaging study should have been performed.
>
> On September 24, 2008, the plaintiff was seen by the PCP who diagnosed nasal allergies, prescribed diphenhydramine and requested a follow up in 1 mo.  There is no evidence that such follow up occurred.
>
> Dr. Pletcher at his initial visit on 6/24/09 states that the patient had a longstanding perforation and gave the patient the same treatment that had been unsuccessful up until that point.  It is unclear where he got the history that it was longstanding especially since the patient was complaining of worsening symptoms and continued to mail letters frequently to that effect.
>
> The plaintiff made numerous attempts in letters to contact Dr. Pletcher with copies to the managing physicians requesting help and pointing out that his symptoms continued to worsen.  It is unclear why Dr. Pletcher has no record of any of these letters since their mailing was documented.  In any event, the authorities at the California Medical Facility should have seen them and acted upon them.  This also lead to unnecessary delay in diagnosis.
>
> There is no question that nasal septal carcinomas are very rare tumors and benign septal perforations are many times more common than septal cancer.  However, in a patient who is immunosuppressed, who develops a new septal perforation without any precipitating factor, the index of suspicion needs to be raised. Then, if the same patient gets more and more symptoms despite conservative management, an etiology for the increasing symptoms

12

needs to be sought.  Diagnostic imaging (CT or MRI) and a simple punch biopsy can be performed on an outpatient basis with minimal morbidity, risk and cost and in this case could have made a major difference in the extent of resection.

Neither Dr. Hall nor Dr. Pletcher ever asked for follow up exam to see if their recommended treatment was beneficial.  Had Dr. Hall, at his first visit on 5/21/08, recommended a 3 month follow up, he would have seen that the patient's symptoms were worsening.  That would have encouraged him to order a diagnostic test (as indicated above:  CT, MRI, and/or biopsy) to make the diagnosis.  In such a circumstance, Dr. Hall could have made a diagnosis by October 2008.  Had Dr. Pletcher taken an appropriate history at his first visit of 6/5/09, he would have understood that the patient's symptoms were worsening despite conservative management, he would not have repeated the previously ordered conservative nasal creams, and he would have been inspired to order a diagnostic test, as well.

Conclusions

***

I therefore conclude that Dr. Osman...also failed to meet the standard of care in the treatment of [plaintiff].

I further conclude that Dr. Osman ... individually and jointly, [was] deliberately indifferent to the serious medical needs of [plaintiff].

(Id. at 7-9.)

The undersigned is sympathetic to plaintiff's medical problems.  However, for the reasons discussed herein, the undersigned finds that defendant Osman should be granted summary judgment because there is no evidence that he acted with deliberate indifference.

The undersigned first observes that the declaration of plaintiff's expert, Dr. Lopchinsky, focuses almost exclusively on treatment plaintiff received from doctors other than defendant Osman.  For this reason, it is difficult to discern the basis of Dr. Lopchinsky's conclusion that defendant Osman acted with deliberate indifference.

The second, and more serious, problem with Dr. Lopchinsky's declaration and opinion regarding defendant Osman is that it does not appear to be based on a review of all of the relevant records.  As discussed above, this action is proceeding on plaintiff's claim that defendant Osman provided inadequate medical care in October 2008.  In his declaration, Dr. Lopchinsky does not address the treatment plaintiff received from defendant Osman in October 2008.  Dr. Lopchinksy states that plaintiff was seen by his primary care provider in September 2008, diagnosed with

13

1    allergies and a one month follow-up which did not occur.  However, it is undisputed that

2    defendant Osman saw plaintiff at least twice in October 2008.  Dr. Lopchinksy's opinion that

3    defendant Osman acted with deliberate indifference for failing to provide plaintiff with follow-up

4    treatment is based on an incomplete review of the record.

5           For the reasons discussed above, the undersigned finds that defendant Osman has

6    provided unopposed expert evidence that he did not act with deliberate indifference toward

7    plaintiff in October 2008.  In his declaration defendant Osman's expert, Dr. Fee, states that it is

8    his opinion that when Dr. Osman treated plaintiff in October 2008, plaintiff's perforation of the

9    nasal septum was already being treated by otolaryngologist Dr. Hall, and it was reasonable and

10   within the standard of care for Dr. Osman to continue the course of treatment recommended by

11   Dr. Hall.  Based on this unopposed expert opinion, the underlying facts of which are supported by

12   the record, the undersigned finds that defendant Osman did not act with deliberate indifference

13   toward plaintiff in October 2008.  Accordingly, defendant Osman's motion for summary

14   judgment should be granted.

15          Accordingly, IT IS HEREBY RECOMMENDED that defendant Osman's summary

16   judgment motion (ECF No. 225) be granted.

17          These findings and recommendations are submitted to the United States District Judge

18   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

19   after being served with these findings and recommendations, any party may file written

20   objections with the court and serve a copy on all parties.  Such a document should be captioned

21   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

22   objections shall be filed and served within fourteen days after service of the objections.  The

23   parties are advised that failure to file objections within the specified time may waive the right to

24   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

25   Dated:  August 4, 2014

26                                                         _____
                                                           KENDALL J. NEWMAN
                                                           UNITED STATES MAGISTRATE JUDGE
27   Jack1157.sj

28

                                                 14